MRS. DAISY T. TAFT, ADMINISTRATRIX OF THE ESTATE OF W. M. TAFT, JR., v. MARYLAND CASUALTY COMPANY.

(Filed 28 April, 1937.)

1. **Insurance § 38—Policy providing liability for injury while riding in "passenger automobile" held not to cover injury while riding in truck.**

   The policy in suit provided liability for accidental injury or death while insured was driving or riding in a "passenger automobile." At the time the policy was issued, insured owned only trucks to the knowledge of insurer's soliciting agent, and at the time of the accidental injury causing insured's death, he was riding in a truck with trailer attached, both of which carried the licenses as prescribed by law, and at the time the vehicle was being used solely for pleasure and not for business purposes. *Held:* The provisions of the policy are not ambiguous, and the policy does not cover the accidental injury resulting in death while insured was riding in the truck, and the fact that the truck was being used for passenger purposes cannot change the nature of the vehicle or the terms of the policy limiting liability to accidental injury or death while insured is riding in a passenger automobile.

2. **Insurance § 13—**

   Where the insurance contract is expressed in clear and unmistakable language, without ambiguity, its construction is for the court.

APPEAL by plaintiff from *Rousseau, J.,* at February Regular Term, 1937, of MECKLENBURG. Affirmed.

The complaint of plaintiff is as follows:

"1. That W. M. Taft, Jr., of late a citizen and resident of Mecklenburg County, North Carolina, died intestate on or about 13 January, 1935, and that Mrs. Daisy T. Taft has been duly appointed by the Superior Court of Mecklenburg County, North Carolina, and has qualified and is now acting as administratrix of the estate of W. M. Taft, Jr., deceased.

"2. That the defendant is a corporation, organized and existing according to law, with its principal offices at Baltimore, Maryland, and, as such, is and was, at the times herein mentioned, engaged in the insurance business.

"3. That on or about 27 April, 1934, for a valuable consideration, the defendant issued and delivered to plaintiff's intestate a certain life and accident insurance policy, under the terms of which the defendant insured plaintiff's intestate in the sum of $1,000 against the loss of life while driving or riding in a passenger automobile.

"4. That on or about 13 January, 1935, plaintiff's intestate lost his life while driving or riding in a passenger automobile.

"5. That said policy of insurance was payable to the estate of plaintiff's intestate and was in full force and effect at the time of his death.

"6. That by reason of said insurance policy and said loss of life, the defendant is indebted to the plaintiff in the sum of $1,000, with interest thereon from 13 January, 1935, until paid.

"7. That demand has been made by the plaintiff upon the defendant for the payment of said sum, and payment thereof has been refused.

"Wherefore, plaintiff prays judgment against the defendant for the sum of $1,000, with interest thereon from 13 January, 1935, and for the costs of the action, to be taxed by the clerk. Carswell & Ervin, Attorneys for Plaintiff."

The defendant denied the material allegations of the complaint, except that it issued the certificate of insurance to plaintiff's intestate, W. M. Taft, Jr.

The material part of the policy to be considered is as follows:

"This Policy Provides Indemnity for Loss of Life, Limb, Sight, or Time by Accidental Means to the Extent Herein Limited and Provided.

"Maryland Casualty Company, Baltimore (Hereinafter called the Company).

"In consideration of the payment of the premium and subject to the terms, conditions, and limitations hereinafter contained.

"Does hereby insure the individual whose name appears below (hereinafter called the Insured), for the term of one year from noon, standard time, at the place where the Insured resides, of the date this policy is dated, against loss resulting from bodily injuries caused directly, solely, and independently of all other causes through accidental means, which bodily injuries or their facts shall not be caused wholly or in part by any disease, and sustained by the Insured in the following manner and subject to all conditions and limitations hereinafter contained:

"(1) While driving or riding in a passenger automobile," etc. "This policy is issued in consideration of an annual premium of One Dollar and Twenty ($1.20) Cents. . . . Insured Name: W. M. Taft, Jr. Expiration Date of Insurance: 4/27/35." The policy provides: "For loss of life $1,000.00."

W. M. Taft, Jr., was killed on the morning of 13 January, 1935, while riding in the truck, with the trailer. Mrs. Daisy T. Taft, the wife of W. M. Taft, Jr., and his administratrix, testified, in part: "I was riding with him that evening, and he was driving when I was with him. We rode to Troy and he left me at his uncle's home at 10:30 o'clock. We rode to Troy in a 1934 Ford V-8 truck. At that time it had a trailer; it was not a covered trailer; it was a flat trailer. We have driven the truck often when the trailer was off. I saw the truck, the one that I rode in, within the next day or two after his funeral. I don't think it was damaged. Something was wrong with it, or at least it couldn't be driven. I know lots of times I have ridden in it with the trailer off.

I don't know what they did with it when it was detached. Q. Did you
have any other automobile, other than this automobile, to ride in? A.
We did not. At the time the policy was sold to us we didn't own any-
thing but trucks and the man that sold us the policy knew that we didn't
have anything but trucks. Q. What I asked you was what other car,
if any, did you have to ride in other than this truck? A. None. I live
in Charlotte. When the trailer is off, there is nothing there by an
enclosed cab. We rode in the enclosed cab. It had an enclosed cab on
it. The night of 12 January, when I was riding with my husband, it
had the trailer on it. After my husband was killed, we took the trailer
off and later we put a dump body on it. That was about a year ago.
I was visiting in Troy. . . . Q. From the time this policy was taken
out up until your husband's death, did you use any other kind of car to
ride in? A. No, we didn't. Q. For what purposes did you use it, to go
what places as a passenger car? A. My home is 150 miles from here.
We went there several times and carried our babies with us, and we went
to Savannah, Georgia, in the same car and took our family with us.
Q. And did you go about Charlotte here in that same car? A. Yes, sir.
For long trips and in town too. . . . My husband was in different
types of trucking business. The trailer was sometimes used for hauling
lumber. It was long enough to haul lumber on. I think he hauled steel
sometimes on that truck. . . . Neither the cab of the truck nor the
frame of the truck has been changed. Those were the same on the 12th
when I was riding in this truck as they are now, to the best of my knowl-
edge. When the trailer is off, this and this is all that is left (pointing
to exhibit). I guess the wheels on it are the same now as then. I guess
it's the same type of wheels and two tires in the rear; I don't remember
any change. The springs, so far as I know, are the same. This truck
was bought primarily to use in our business. When my husband had
work, it was used most of the time in his business, but we were not
working for quite a while before he was killed, I imagine it was about
six weeks. . . . Q. For six weeks prior to the time your husband
was hurt, what was the truck used for? A. We used it for business and
sometimes we took trips in it. When he was not working, we used it for
our own pleasure. We went to Troy on 12 January to visit relatives at
Troy. We went to spend the week-end. My husband's people lived
at Troy."

Albert Van Cannon testified in part that he was driving the truck
when the accident occurred. "About two and one-half miles the other
side of Troy, we were coming up the River Hill and I ran off the road
in the ditch, and when I pulled back on the road, the door came open and
he (plaintiff's intestate) fell out. I kind of fell asleep, started off just
a second, and ran off of the road. He fell out on the ground when the

door came open. When I picked him up, he was unconscious. I took him to Dr. Harris. He lived for about 30 minutes after that. . . . I don't know definitely, but I guess the trailer on this truck I was driving was about twenty feet long. I don't know whether it had a truck license on it or not. . . . It had four wheels in the rear. I couldn't say about the springs that were on it. As far as I can tell, the chassis of the truck I was driving is the same as the one shown in plaintiff's exhibit. . . . The truck the night that Mr. Taft and I had it was not used for any business purpose. It was being used for pleasure. Mr. Taft went to the truck about 12:30 o'clock, I believe. When I came to the truck a little after 3 o'clock, he was asleep."

J. E. Hurley testified: "I live at Troy. I was acquainted with this truck in question. I saw it before the collision. This trailer was detachable. We have trailers at the lumber plant, and this was constructed the same way as mine. I am acquainted with the 1934 automobile trailer type truck. To take the trailer off, we drive the truck under the chain pole and lift up the trailer and then drive the truck from under it. It takes about 10 or 15 minutes to do that. This particular automobile was of that type."

The plaintiff made numerous exceptions and assignments of error and appealed to the Supreme Court. The material ones will be considered in the opinion.

*G. T. Carswell and Joe W. Ervin for plaintiff.*
*Robinson & Jones for defendant.*

CLARKSON, J. At the close of plaintiff's evidence, the defendant in the court below made a motion for judgment as in case of nonsuit. C. S., 567. The court below sustained the motion, and in this we can see no error.

The language in the policy to be construed is: "While driving or riding in a passenger automobile." The language is clear and not ambiguous. The vehicle in which plaintiff's intestate was riding when killed was a 1934 Ford V-8 truck. It had a trailer about 20 feet long, four wheels in the rear. It was being driven with the trailer the night on which plaintiff's intestate was killed. There is a vast difference between a truck and a passenger automobile. The difference is recognized in this State by statute. As to a truck, C. S., 2621 (46a), is as follows: "No motor vehicle designed, equipped for, or engaged in transporting property shall be operated over the highways of the State at a greater rate of speed than thirty-five miles an hour, and no such motor vehicle to which a trailer is attached shall be operated over such highways at a greater rate of speed than thirty (30) miles an hour." As

to passenger vehicle, C. S., 2621 (46), says: "Speed restrictions—(a) No person shall drive a vehicle on a highway at a speed greater than is reasonable and prudent under the conditions then existing. (b) Where no special hazard exists the following speeds shall be lawful, but any speed in excess of said limits shall be *prima facie* evidence that the speed is not reasonable or prudent, and that it is unlawful. (4) Forty-five miles per hour under other conditions," etc.

The cost of license is different for a passenger automobile and a truck. C. S., 2612, "Rates for automobiles" are set forth, and "Rates for trucks," and "on all trailers $15.00 per ton carrying capacity." Plaintiff administratrix testified: "My husband bought a truck license for it and had said license on it the night he was killed."

In *Lloyd v. Ins. Co.*, 200 N. C., 722, the statement of the case, in part, is as follows: "The policy provided an indemnity of $1,000 for death from accidental bodily injuries if such death resulted from 'the wrecking or disablement of any private horse-drawn vehicle, or private automobile of the pleasure-car type in which the insured is riding or driving,' etc. The evidence tended to show that at the time of his death the deceased was riding in a 1929 Model A, one and a half ton Ford truck. This truck has an enclosed cab with a seat that would accommodate three passengers comfortably. The owner of the truck testified that it was used for hauling passengers and truck. He said: 'There was no place at the back for passengers to ride. That was to carry what we wanted to haul. We had a body on the back. Sometimes I took my family to church on it. . . . We had a car other than this truck. . . . On the back is a truck body which was used for hauling milk from the Lawrence Dairy on the milk route. It was used for most anything that come to hand and done more hauling of milk than anything else. I also had a five-passenger Ford touring car. That was the principal pleasure car of the family. . . . There was a wreck.' Two other men were riding in the truck with the deceased at the time of the wreck. The third issue was as follows: 'Was plaintiff's intestate killed by the wrecking and disablement of a private automobile of the pleasure-car type in which insured was riding, as alleged in the complaint?' At the close of plaintiff's testimony the trial judge intimated that he would give a peremptory instruction directing the jury to answer the third issue 'No.' " The question in this case was: "Is a Ford one and a half ton truck, used principally for hauling milk, 'a private automobile of the pleasure-car type?' " The court concludes its opinion: "Manifestly, the truck in which plaintiff's intestate was riding at the time of his death was by intention, use, and construction a commercial vehicle, and so classified by the North Carolina statute. Consequently, the coverage clause of the policy issued by the defendant did not, upon the evidence, include the

accidental death of plaintiff's intestate, and the ruling of the trial judge is upheld." We are of the opinion that this case is determinative of the present one.

The plaintiff relies on *Conyard v. Ins. Co.,* 204 N. C., 506, and *Fidelity & Casualty Co. v. Martin,* 66 Federal Reporter (2nd series), 438 (9th circuit).

In the *Conyard case, supra,* the deceased "Held an insurance policy with the defendant company which provided an indemnity of $1,000 for death from accidental bodily injuries resulting from the 'collision of or by any accident to any private drawn vehicle or private motor driven car in which the insured is riding or driving.'" It was held: "The term 'motor driven car' is broad enough to include a motor driven truck, and we cannot say a narrower interpretation was intended by the parties. The rule of construction is, that when an insurance policy is reasonably susceptible of two interpretations, the one more favorable to the assured will be adopted. 'The policy having been prepared by the insurers, it should be construed most strongly against them' (citing authorities). There is nothing said in *Lloyd v. Ins. Co.,* 200 N. C., 722; *Anderson v. Ins. Co.,* 197 N. C., 72; or *Gant v. Ins. Co.,* 197 N. C., 122, which militates against the position here taken."

In the *Martin case, supra,* the factual situation was different. "Roy Anderson, a Ford salesman, testified that the car purchased by Mr. Martin was a Ford roadster, a pick-up body, and not a truck." The Court in that case said (at pp. 440-1): "If the car had been a Ford roadster equipped to carry passengers only; *or a heavy truck solely adapted to carry freight, and the necessary attendants and operators,* no doubt the question of the applicability of the policy of insurance to accidents occurring therein would be a question of law, but, where the automobile is of the character disclosed by the evidence, its classification is one of fact to be determined by the court or jury, as the case may be." (Italics ours.)

Neither of the above cases is similar to the present one. The language of the policy here is: "While driving or riding in a passenger automobile." The plaintiff's intestate was riding when killed (1) in a 1934 Ford V-8 truck; (2) it carried a truck license with a trailer (the trailer was an additional license cost), and when plaintiff's intestate was killed it was a truck with the trailer attached; (3) there is no part of the vehicle which is the same as an ordinary passenger car; (4) the wheels (double in the back), the springs, the chassis, and everything is different, and it was designed and built for the sole purpose of hauling— it was a truck; (5) the State license fee was for truck hauling and different from the State license fee for a passenger automobile; (6) the truck was bought primarily to be used in business; (7) under the rule

of the road it was prohibited from being driven as fast as a passenger automobile; (8) the cheapness of the policy ($1.20 per year premium with payment for loss of life $1,000) covered injury while driving or riding in a passenger automobile—not a truck. This would indicate clearly that it was not a passenger automobile in which many might ride compared with a few in a truck. The duty of a court is to *construe* and not *make* contracts—that is for the parties to do. *Gilmore v. Ins. Co.,* 199 N. C., 632. The fact that the truck in question was used for passenger purposes cannot change the nature of the vehicle or the terms of the contract. The intention of the parties is shown by the clear and unmistakable language used, no ambiguity. It is the duty of a court in such cases to construe the contract. The fact that the truck was used for pleasure trips does not make it a passenger automobile so as to nullify the plain language of the contract.

The death of plaintiff's intestate was a sad misfortune, which in no way defendant was responsible or liable for under the policy sued on.

For the reasons given, the judgment of the court below is

Affirmed.